UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
IN RE: SONY CORP. SXRD REAR PROJECTION
TELEVISION MARKETING, SALES PRACTICES
AND PRODUCTS LIABILITY LITIGATION

                                                    09-MD-2102 (RPP)
                                                    **OPINION AND ORDER**

------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

On May 21, 2010, the Court ordered Counsel for the plaintiffs in *Meserole, et al.*

*v. Sony Corp., et al.*,[1] Milberg LLP, by Leigh Smith, Sanford Dumain and Jennifer

Czeisler, Lax LLP, by Robert Lax, and Lange & Koncius LLP, by Joseph Lange and

Jeffrey Koncius (hereinafter "Counsel for the *Meserole* Plaintiffs"), to show cause why

certain statements contained in the Second Amended Complaint and made on the record

do not constitute violations of Rule 11 of the Federal Rules of Civil Procedure.  At issue

here are statements purportedly from two confidential sources, quoted in a complaint

filed with the court and emphasized at oral argument, that if accurate would be relevant to

Plaintiffs' claims of consumer fraud due to Sony's knowledge, alleged therein, of defects

in certain models of televisions at issue in this litigation, manufactured by Sony, and sold

to consumers.  Because of these statements by Counsel for the *Meserole* Plaintiffs, the

Court, before determining potentially dispositive motions to dismiss, ordered on

December 23, 2009 that the depositions of the confidential sources be taken by counsel.

---

[1] Counsel for Plaintiff Meserole also represents plaintiffs in these related actions: *Ouellette, et al. v. Sony Corporation of America, et al.*, *Webber, et al. v. Sony Corporation of America, et al.*, *Raymo, et al. v. Sony Corporation of America, et al.*,  and *Cruisinberry, et al. v. Sony Corporation of America, et al.*  For simplicity and clarity, the Court refers to the actions taken by Counsel for the *Meserole* Plaintiffs in the *Meserole* matter, but notes that the same counsel took many of the identical actions, and made identical representations, in connection with their representation of plaintiffs in the related matters.

At confirmatory depositions, both confidential sources directly contradicted the statements attributed to them.  Because Counsel for the *Meserole* Plaintiffs made objectively unreasonable representations in pleadings submitted to the Court, orally in presentations to the Court, and in motion papers without making a sufficient or appropriate investigation as to the truth of such statements, Milberg LLP, Leigh Smith, Sanford Dumain, Jennifer Czeisler, Lax LLP, Robert Lax, Lange & Koncius LLP, Joseph Lange, and Jeffrey Koncius are reprimanded.

## I. Facts and Proceedings

In October 2008, Paul Meserole commenced the first of the class actions, subsequently consolidated by the Panel for Multidistrict Litigation with four other class action complaints filed by the same counsel and two other class action complaints filed by separate counsel, concerning defective optical blocks in the same models of television sets manufactured and sold by Sony.  While not immediately apparent to the purchaser, the defects allegedly caused various color anomalies and discolorations to manifest themselves over time that "severely interfere with the program display."  (Compl. ¶ 3.) The Complaint concerned the second generation of SXRD rear projection television sets, the first generation of which had been the subject of an earlier lawsuit, consolidated and heard in this Court, *In Re: Sony SXRD Rear Projection Television Class Action Litigation*, 06-cv-5173 (RPP), in which the class was represented by class counsel, some of whom now serve as attorneys for the *Meserole* Plaintiffs.

A First Amended Complaint ("FAC") in *Meserole* was filed on December 5, 2008, and in January 2009, the Defendants moved to dismiss the FAC.  Neither the

Original Complaint nor the FAC contained allegations by confidential sources.  In an opinion issued on May 19, 2009, the Court granted the Defendants' motion to dismiss in full and dismissed the FAC without prejudice to repleading.  The Court dismissed the claims sounding in fraud in part because the FAC failed to "put forth any particularized allegations evincing that Sony knew about the alleged defect prior to distributing the products to Plaintiffs."  *Meserole v. Sony Corp. of Am.*, No. 08-cv-8987, 2009 WL 1403933, at *4 (S.D.N.Y. May 19, 2009).

On June 17, 2009, Counsel for the *Meserole* Plaintiffs filed the Second Amended Complaint ("SAC"), containing allegations attributed to two former employees of Sony ("confidential sources").  They filed a nearly identical Consolidated Amended Class Action Complaint superseding the original complaints filed in several of the related cases on October 15, 2009 – although this opinion refers primarily to the SAC, all allegations about the confidential sources are repeated in identical form in the Consolidated Amended Class Action Complaint filed by the same counsel.

### A. Representations to the Court

In the SAC, Counsel for the *Meserole* Plaintiffs alleged: "As stated by a former Sony factory technician in Sony's manufacturing and assembly facility in Mount Pleasant, Pennsylvania, employed by Sony from 1994-2007 ('Confidential Source #1') with respect to the defect in design of the Optical Block contained in the Televisions [defined in the complaints to be models KDS-R60XBR2, KDS-R70XBR2, KDS-50A2000, KDS-55A2000, and KDS-60A2000]: '**Every single television that left the plant was bad and they knew it**.'"  (SAC ¶ 22 (emphasis in original).)  Counsel for the *Meserole* Plaintiffs have since conceded in their response to the order to show cause that

the in-house investigator's notes from which the quotation was taken show that this quotation was taken out of context.  In full, the quotation would have read: "In 2005, if Sony sent out one million television sets, they got one million back.  Every single television that left that plant was bad and they knew it."[2]  (Leigh Smith Decl. ¶ 17.)  The missing introductory sentence is significant because Sony television sets manufactured in 2005 are not the sets complained of in the SAC or the Consolidated Amended Class Action Complaint, which relate only to models manufactured and sold thereafter.  (SAC ¶ 24.)

Counsel for the *Meserole* Plaintiffs also alleged in the SAC: "a former Sony factory technician in Mount Pleasant, Pennsylvania employed by Sony from 1996-June 2007 ('Confidential Source #2') noted that the Optical Block Defect at Sony was a 'huge' problem, and that, despite its knowledge of the defect, Sony did not re-engineer its Optical Blocks but instead replaced consumers' Optical Blocks with refurbished ones and charged $700 in each instance for the refurbished Optical Blocks used to replace the ones that failed."  (SAC ¶ 23.)

At oral argument on the Defendants' motion to dismiss the SAC, held on September 14, 2009, Counsel for the *Meserole* Plaintiffs repeatedly referenced the allegations in the SAC concerning the confidential sources.  Counsel for the *Meserole* Plaintiffs described these allegations as "prov[ing] that Sony knew that these televisions were all defective before they offered a single one for sale."  (Transcript (Sept. 14, 2009)

---

[2] The declaration of Leigh Smith goes on to state that counsel asked the investigator to reinterview Confidential Source #1 to make sure there was adequate support for the allegations attributed to Confidential Source #1 in the SAC and the Consolidated Amended Class Action Complaint.  (Leigh Smith Decl. ¶ 19.)  Additionally, the declaration states that Confidential Source #1 confirmed that her prior statements about the optical blocks were applicable to the television sets at issue in this case: KDS-R60XBR2, KDS-R70XBR2, KDS-50A2000, and KDS-60A2000.  (*Id*. at ¶ 21.)

at 13.)  Additionally, Counsel for the *Meserole* Plaintiffs relied upon the allegations about

the confidential sources in arguing that "all that Sony is doing – this is in paragraph 23,

citing former employees of Sony – is that they are using refurbished optical blocks, they

are using the same old optical blocks, they are sending them back to Mount Pleasant,

refurbishing them, and sending them out into the world where they know they are going

to fail."  (*Id.* at 43-44.)  In their briefings and oral presentation to the Court, Counsel for

the *Meserole* Plaintiffs relied heavily upon the confidential source allegations to argue to

the Court that the SAC was different from the First Amended Complaint, in that it

properly alleged the scienter element of the fraud claims.

      In a letter to the Court, dated January 4, 2010, Counsel for the *Meserole* Plaintiffs

wrote in advance of the confirmatory discovery, which was scheduled to include

depositions of both confidential sources: "The Confidential Sources are prepared to give

deposition testimony later this month regarding the defect plaintiffs allege is inherent in

Sony's XBR2 televisions, Sony's inability to correct the defect, and Sony's abandonment

of further countermeasures to correct the defect."

      In their responsive papers to the Court's May 21, 2010 Order to Show Cause,

Counsel for the *Meserole* Plaintiffs aver that the allegations about the confidential

sources "were drawn from an investigation that included interviews of former employees

and other persons with potential knowledge of the issues pertaining to this litigation by an

in-house Milberg investigator."  (Leigh Smith Decl. ¶ 7.)  The in-house investigator

prepared three separate investigative memoranda after interviewing the confidential

sources and others.  (*Id.* ¶ 15.)  Counsel for the *Meserole* Plaintiffs requested that the

Court review the investigative reports *in camera* because they were subject to the work

product privilege.  The Court declined to agree to an *in camera* review of the investigation memoranda, pointing out that Plaintiffs' reliance on the submission of the investigative reports would risk relinquishing Plaintiffs' work product privilege over these and related documents.  Counsel for the *Meserole* Plaintiffs did not thereafter submit the investigator's memoranda to the Court.  Rather, in a conclusory declaration attached to the response to the order to show cause and not purporting to be based on personal knowledge, Leigh Smith also declared: (1) the investigator met with Confidential Source #1 repeatedly; (2) Confidential Source #1 confirmed that the optical block problems affected many of the models that are the subjects of this lawsuit; and (3) the investigator's work was supervised by the attorneys.  (*Id.* ¶¶ 18-21.)  Counsel for the *Meserole* Plaintiffs did not submit an affidavit or declaration from the investigator, from any of the other attorneys for the *Meserole* Plaintiffs, or anyone else.

### B. Depositions of the Confidential Sources

The Court's order on December 23, 2009 that the confidential sources be deposed followed the announcement by letter dated November 12, 2009 from counsel for Sony and counsel for one of the other plaintiffs, Sabrina Cardenas, that they had reached a settlement on behalf of the class with the Defendants.  Accordingly, the allegations of the confidential sources were relevant not only to the pending motion to dismiss but also to the Court's consideration of the fairness of the proposed settlement.  Plaintiff Cardenas was represented by the law firm of Federman & Sherwood, subsequently appointed by the Court on May 19, 2010 as class counsel for a fairness hearing, over the objections of Counsel for the *Meserole* Plaintiffs.

### 1. Deposition of Confidential Source #2

On January 28, 2010, counsel for all parties to this litigation were present at the deposition of Confidential Source #2.[3]  The deponent testified that he had worked for Sony from March of 1996 through June 30, 2007.  (Transcript (Jan. 28, 2010) at 5-6.)  Confidential Source #2 worked with the models that are the subject of this litigation during his time at Sony.  (*Id*. at 9.)  He confirmed that there were substantial problems with the optical blocks in the rear projection televisions, but he was unaware of any of these problem sets ever being sold to consumers.  (*Id*. at 11, 36.)  The problems with the optical blocks were primarily about the blocks being contaminated by dirt; Sony fixed the problem by cleaning the blocks, rather than engineering a fix.  (*Id*. at 11-12.)  The contamination came from the shipping process.  (*Id*. at 13.)  Confidential Source #2 testified that he was aware of no other problems, besides the contamination, with the optical blocks.  (*Id*. at 29.)  He also testified that any contamination would be immediately apparent – from the first time the television was turned on – and was detected at the inspection stations on the assembly line.  (*Id*. at 30, 34.)  He specified that

---

[3] There is some dispute as to whether the January 28, 2010 deposition was of Confidential Source #1 or Confidential Source #2.  In their motion for sanctions, sent to Plaintiffs on February 12, 2010, Defendants referred to the January 29, 2010 deponent as Confidential Source #1, and the January 28, 2010 deponent as Confidential Source #2.  In their March 5, 2010 letter to Defendants, Counsel for the *Meserole* Plaintiffs contend, however, that the January 28, 2010 deponent was Confidential Source #1, and the January 29, 2010 deponent was Confidential Source #2.  In a responsive letter dated March 8, 2010, Defendants rejected this assertion, noting that the dates of employment listed in the SAC for Confidential Source #1 correspond to the dates given by the January 29, 2010 deponent, and the dates of employment listed in the SAC for Confidential Source #2 correspond to the dates given by the January 28, 2010 deponent.  Then, in papers submitted by the Defendants to this Court on March 9, 2010 in support of the preliminary approval of the proposed settlement, Defendants reported, "The *Meserole* Plaintiffs have taken the position they might have been 'mistaken' about which witness was Source No. 1 and which was Source No. 2."  (Def. Mem. in Support of Mot. for Prelim. Approval at 18 n.5.)  In their response to the Order to Show Cause, Counsel for the *Meserole* Plaintiffs attribute quotations from the January 29, 2010 deposition to Confidential Source #1.  (*See, e.g.,* Pl. Mem. Resp. to Order to Show Cause at 10.)  Thus, it appears that Counsel for the *Meserole* Plaintiffs no longer contests the Defendants' attributions to Confidential Source #1 and to Confidential Source #2.  The Court notes, however, that due to the failure of Counsel for the *Meserole* Plaintiffs to cite to the transcripts of these depositions when quoting them and the above-described confusion, the Court had some difficulty in verifying that, in fact, the *Meserole* Memorandum attributed the January 29, 2010 deposition to Confidential Source #1.

the defects of which he was aware were not the sort that would appear gradually or that

became apparent after months of use.[4]  (*Id.* at 30-31.)  He also testified that the issue was

resolved by improving the "standards of packaging before [the optical block] was shipped

overseas" from Japan to the Sony assembly plant in Pennsylvania.  (*Id.* at 35.)  While he

testified that Sony might have put cleaned (i.e. refurbished) optical blocks into a

television set as a replacement, he emphasized that they would not have sold that

television with the refurbished block at retail.  (*Id.* at 45.)  He also testified that he was

not aware of Sony ever having put any product "out in the marketplace that it knew was

defective."  (*Id.* at 59.)

   When asked about how he became involved in this case, Confidential Source #2

testified as follows:

> A. There's another lawyer out of New York, he called me, I have
> no idea how he got my name.
> Q. What's his name?
> A. I don't even know.  This guy harassed me about this case,
> okay.  And he was sending me emails, you know.  And he said that
> he was a lawyer.  Well, nowadays, you know, you get emails and
> telephone calls, they're trying to sell you something or – basically
> telemarketers, you know, we'd like to sell you this widget today.  I
> thought this guy was blah, blah, blah, they'll tell you anything, I
> thought he was a widget salesman.  So he asked me about Sony.
> So I told this man about Sony.  And he's sending me emails.  I
> thought the little widget man would go away.  So I just, you know,
> don't fight City Hall, just leave it go.  (*Id.* at 25-26.)

Confidential Source #2 testified that he told the "widget salesman" about the problems

with the optical blocks, and explained that they were due to contamination.  (*Id.* at 33.)

He also testified that the "widget salesman" did not ask him if he knew whether any of

the problem optical blocks had been shipped out to consumers.  (*Id.* at 40-41.)  He stated

---

[4] The defect that is the subject of this lawsuit "manifested itself over time."  (SAC ¶ 3.)

that he thought "the widget salesman was jumping to the conclusions that the sets that I said were bad was the consumer sets.  I never saw any bad consumer sets."[5]  (*Id*. at 41.) In sum, the testimony of Confidential Source #2 was that he was not aware of any problem sets sold to consumers, that he did not know of Sony having put into the marketplace any television sets it knew was defective, and that Sony would not have, and had not, sold any television sets containing refurbished blocks.  In view of the foregoing, the Court concludes that the allegations contained in the SAC and the Consolidated Amended Class Action Complaint that Confidential Source #2 stated that "despite its knowledge of the defect, Sony did not re-engineer its Optical Blocks but instead replaced consumers' Optical Blocks with refurbished ones and charged $700 in each instance," lacked evidentiary support.[6]  The Smith Declaration does not contain any support for this statement in the SAC.

### 2. Deposition of Confidential Source #1

On January 29, 2010, counsel for all parties to this litigation were present at the deposition of Confidential Source #1.  Confidential Source #1 testified that he worked for Sony from September of 1994 through July of 2007.  (Transcript (Jan. 29, 2010) at 6.) He testified that he did not work with XBR-1 televisions, XBR-2 televisions, A2000 televisions, A10 televisions, or A20 televisions.  (*Id*. at 8.)  He had, however, been involved in replacing optical blocks.  (*Id*. at 9.)  He testified that he "[l]earned that a lot of sets were being returned for optical block failure," but he did not know what the precise problem was.  (*Id*. at 10-11.)  The failure with the optical block manifested itself

---

[5] By "consumer sets," the deponent was referring to "sets [that] got to the consumers."  (*Id*.)  That source also emphasized that, to his knowledge, when there were problems with the optical blocks, they were labeled "reject sets" and taken out of production.  (*Id*. at 11.)
[6] Confidential Source #1 also denied this statement.  ((Transcript (Jan. 29, 2010) at 55.)

in altering the brightness of the televisions, such that viewers would see a "higher contrast" and "picture quality would decrease." (*Id*. at 11.) He testified that he was unaware of any issues involving discoloration; all optical block issues that he knew of related to brightness. (*Id*. at 46.)

Confidential Source #1 testified that at one point he believed that "every television that left that plant had a problem with an optical block." (*Id*. at 15.) He testified however, that this was when he was working with the optical blocks, from "spring of '04 to probably fall, end of fall of '05." (*Id*. at 17.) This time period predates the sale and manufacture of the models of television sets that are the subject of the SAC and the Consolidated Amended Class Action Complaint (*see* SAC ¶ 23) and is consistent with the full quotation, only part of which was included in the SAC and Consolidated Amended Class Action Complaint, about the televisions leaving the plant in 2005. He also testified that he heard rumors "that there was so many customer complaints regarding optical blocks that retail stores began to send back unsold Sony TVs to have the optical blocks replaced" in "late '05, middle of '06" and as late as 2007. (*Id*. at 19, 67.) He later clarified, though, that he had nothing to do with optical blocks in 2006 and 2007. (*Id*. at 38.) And he further clarified that he had no knowledge of any serious problems with optical blocks after, at the latest, January or February of 2006. (*Id*. at 47, 56.)

When questioned by counsel for Sony, Confidential Source #1 testified that in his thirteen years at Sony, he was unaware of Sony ever knowingly putting defective optical blocks on the market and did not think that Sony would ever do so. (*Id*. at 27, 31-32, 66.) Confidential Source #1 also testified that he believed that when television sets were

returned by stores – not by individuals – Sony replaced the optical blocks and sent them

back out with the new optical block.  (*Id*. at 34-35.)  However, he clarified that he had no

knowledge of whether Sony refurbished an optical block or how they would refurbish an

optical block if they were to do so.  (*Id*. at 51.)  He further clarified that he had no

dealings with consumers and had no knowledge of whether "Sony charged consumers

$700 to replace defective optical blocks."  (*Id*. at 55.)  Thus, he could not have been the

source of the statement in the SAC that Sony charged $700 to replace defective optical

blocks with refurbished optical blocks.[7]

  When asked about how he became involved in the case, Confidential Source #1

testified that multiple attorneys contacted him.  (*Id*. at 58-59.)  He could not remember

each attorney's name, but he did testify that an attorney named Jennifer had contacted

him.  (*Id*. at 58.)  In sum, Confidential Source #1 testified that he was unaware of Sony

ever knowingly putting defective optical blocks on the marketplace and did not think

Sony would do so, that he did believe that every television that left the plant in 2005

(prior to the manufacture of the models which are the subject of the SAC and the

Consolidated Amended Class Action Complaint) had a problem with the optical block,

and that he had no knowledge of any serious problems with the optical blocks after, at the

latest, January or February of 2006.  (*Id*. at 15, 17, 19, 27, 31-32, 66, 67.)  In view of the

foregoing, the Court concludes that the allegations in the SAC and the Consolidated

Amended Class Action Complaint that Confidential Source #1 stated that "every single

television that left that plant was bad and they knew it" was based on an out of context

---

[7] The SAC attributed this to Confidential Source #2, but because there was some confusion about which of the deponents was Confidential Source #1 and Confidential Source #2, the attorneys for Sony asked Confidential Source #1 about these statements attributed by the SAC to Confidential Source #2.  (*Id*.)

quotation from an in-house investigator's report relating to the earlier model television

sets and had no evidentiary support from either confidential source's deposition

testimony.

### C. Notice to Counsel for Meserole Plaintiffs

On February 12, 2010, Defendants served a Motion for Sanctions on the

Plaintiffs, but, in compliance with Rule 11(c)(2)'s safe harbor provision, did not file it

with the Court.  (Exhibit 2 to June 4, 2010 Letter from Defendants to the Court.)  In their

motion, Defendants argued that the depositions of Confidential Sources #1 and #2 "stand

in stark contrast" to the allegations made by the Plaintiffs to the Court, and therefore that

the Plaintiffs had misrepresented or "failed to conduct even the most basic inquiry into

the Confidential Sources' knowledge and beliefs."  (*Id*.)  They argued that either was

grounds for sanctions under Rule 11.  (*Id*.)

On March 5, 2010, the last day of the 21-day safe harbor period, Sanford Dumain,

on behalf of Counsel for the *Meserole* Plaintiffs, wrote an intra-counsel letter in response

to the Defendants' Rule 11 motion.  In it, he asserted that the Defendants' motion, if

filed, "would itself be sanctionable."  (*Id*.)  He wrote that the Defendants were wrong in

their assertion that the January 28 deposition was of Confidential Source #2, and that the

confidential witnesses' identities had been accidentally transposed.  (*Id*.)  He refused to

strike allegations attributed to Confidential Source #2 in the SAC.  (*Id*.)  However, he

agreed to strike the allegations attributed to Confidential Source #1, but then noted that

"[t]he allegation [in the SAC] that 'every single television that left the plant was bad and

they knew it,' was mistakenly attributed to [Confidential Source #1]" and should instead

be attributed to Confidential Source #2.  (*Id*.)  As the Defendants subsequently pointed

out, as this is the only statement attributed to Confidential Source #1, the agreement to strike the allegations attributed to Confidential Source #1 did not strike any allegations and was entirely meaningless.

On March 8, 2010, Defendants responded to Counsel for the *Meserole* Plaintiffs by an intra-counsel letter.  In the letter, the Defendants re-articulated the argument in their motion, now on the assumption that all three statements in the complaint were being attributed by Counsel for the *Meserole* Plaintiffs to Confidential Source #2.  (*Id.*) Defendants stated their intention to move ahead with their Rule 11 motion unless the Plaintiffs agreed to retract all statements attributed to the confidential witnesses by the close of business on March 9, 2010.

On March 9, 2010, the Defendants, in their memorandum of law in support of the motion for preliminary approval of the class action settlement negotiated with Federman & Sherwood, alerted the Court to the disputes surrounding the depositions of the confidential witnesses.  The Defendants, to show the testimony contradicting the alleged statements attributed to the confidential sources, attached transcripts of the depositions of Confidential Sources #1 and #2 as exhibits in support of the motion.  On March 11, 2010, not having received an agreement to strike from Counsel for the *Meserole* Plaintiffs, the Defendants moved to dismiss the Consolidated Amended Class Action Complaint.  In support of their motion, the Defendants attached as exhibits their safe harbor motion for sanctions, which had been served on Plaintiffs but not filed, along with the above detailed intra-counsel correspondence.

On March 11, 2010, Counsel for the *Meserole* Plaintiffs wrote an intra-counsel letter to Defendants responding to Defendants' March 8, 2010 letter.  In it, Plaintiffs

maintained that they "had a reasonable good faith basis for every allegation in the
Consolidated Amended [and] *Meserole* Complaints." (*Id*.) Although they refused to
concede that there was "any merit" to Sony's Rule 11 motion, Counsel for the *Meserole*
Plaintiffs agreed to strike "all of the allegations that were attributed to the confidential
sources." (*Id*.)

On March 16, 2010, Defendants wrote in intra-counsel correspondence to enquire
"when and in what manner plaintiffs will be striking the confidential source allegations."
(*Id*.) On March 19, 2010, Counsel for the *Meserole* Plaintiffs responded in intra-counsel
correspondence that they would "file amendments where needed that delete the
appropriate allegations." (*Id*. (emphasis added)) On March 23, 2010, Defendants
followed up in intra-counsel correspondence to determine when the amendments would
be filed. (*Id*.) On March 24, 2010, Counsel for the *Meserole* Plaintiffs stated that they
would "send proposed amendments on Friday [March 26, 2010]." (*Id*.)

Despite this agreement, on March 26, 2010, Counsel for the *Meserole* Plaintiffs
did not send the proposed amended pleadings to Defendants, but submitted a
memorandum in opposition to the motion for preliminary approval of the proposed class
action settlement in which they stated: "the deposition testimony of Confidential Source
No. 1 ('CS1') supports the core allegations in the Complaint. CS1 specifically testified
that his memory was 'cloudy' with respect to timeframes. More significantly, the claim
that his testimony fails to support the allegations in the Complaints is simply wrong."
(Pl. Opp. to Mot. for Prelim. Approval at 22, n.20.) In that same memorandum, Counsel
for the *Meserole* Plaintiffs argued that "Sony repeatedly mischaracterizes the statements
made regarding the two confidential sources quoted in the Complaints." (*Id*. at 22.)

14

Given that Counsel for the *Meserole* Plaintiffs had already agreed privately to strike these allegations, the Court can discern no litigation reason for filing responsive papers relying upon the confidential sources' statements, as alleged in the SAC. The Court is aware, however, that a blog run by a consumer advocate has been following the MDL litigation and that Counsel for the *Meserole* Plaintiffs could benefit from consumer support of their opposition to the settlement agreement as proposed by Federman & Sherwood. (Letter to the Court from Stephen P. Linke (Mar. 25, 2010).)

On April 21, 2010, the Court was advised that the allegations concerning the confidential sources were being stricken by a stipulation signed by Counsel for the *Meserole* Plaintiffs and counsel for Defendants.

On May 21, 2010, this Court issued an order to show cause why Counsel for the *Meserole* Plaintiffs should not be sanctioned for violations of Rule 11.[8]

## II. Discussion

Federal Rule of Civil Procedure 11(b) provides: "By presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it – an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the factual contentions have evidentiary support, or if so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery . . . ."

---

[8] The Court had previously advised the parties, on May 3, 2010, that such an order would be issued. (Transcript (May 3, 2010) 34.) Preliminary approval to the proposed class action settlement was granted on May 19, 2010.

Rule 11(c) governs sanctions.  Rule 11(c)(1)-(2) governs sanctions when a party moves for sanctions.  Of note to this decision, Rule 11(c)(2) contains a safe harbor provision providing that the motion must be served pursuant to Rule 5, "but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention or denial is appropriately corrected within 21 days after service or within another time the court sets."

In the absence of a motion for sanctions, the Court may *sua sponte* "order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b)."  F.R.C.P. 11(c)(3).

### A. Mens Rea

In considering a potential Rule 11 violation, a court must determine whether the sanctionable actions were conducted with adequate showing of *mens rea*.  The Second Circuit has held that the *mens rea* standard will vary based on the notice given to the party to be sanctioned.  When a party files a motion for sanctions, after the appropriate safe harbor period has passed and the party or attorney against whom sanctions are sought refuses to withdraw or correct the challenged assertion, "liability may be imposed if the lawyer's claim to have evidentiary support is not objectively reasonable."  *In re Pennie & Edmonds LLP*, 323 F.3d 86, 90 (2d Cir. 2003).  This standard is appropriate "where the lawyer whose submission is challenged by motion has the opportunity, afforded by the 'safe harbor' provision, to correct or withdraw the challenged submission."  *Id*.  Under this standard, "sanctions shall be imposed against an attorney and/or his client when it appears that a pleading has been interposed for any improper purpose, *or where*, after reasonable inquiry, a competent attorney could not form a

reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir. 1985) (emphasis in original).

A different standard applies to the second situation in which the lawyer or party "has no opportunity to withdraw or correct the challenged submission." *In re Pennie & Edmonds LLP*, 323 F.3d. at 87. The Second Circuit has explained that "when a lawyer's submission, unchallenged by an adversary, is subject to sanction by a court, the absence of a 'safe harbor' opportunity to reconsider," the imposition of sanctions only upon a showing of objective unreasonableness would be unfair and would have a chilling effect on lawyers. *Id*. at 91. The Second Circuit adopted "a heightened *mens rea* standard" for "unchallenged submissions" – namely, that the party or lawyer acted in bad faith. *Id*. The Second Circuit declined, however, to apply this standard to all court-initiated Rule 11 sanctions, and limited it to situations in which the litigation has progressed to such a stage that the parties cannot withdraw the challenged assertions once given notice. *Id*. at 91-92.

The situation presented by the instant case does not fall neatly into either category. While the Court initiated this inquiry, Defendants served but did not file a motion for sanctions on February 12, 2010, giving Counsel for the *Meserole* Plaintiffs notice of the allegedly sanctionable conduct, but Counsel for the *Meserole* Plaintiffs did not – as they claimed in their response papers (Leigh Smith Decl. ¶ 12) – fully withdraw the challenged assertions until April 21, 2010, over forty-five days after the termination

of the twenty-one day safe harbor period required by Rule 11(c).[9]  Moreover, the

Defendants, rather than Counsel for the *Meserole* Plaintiffs, were the first to notify the

Court that the confirmatory discovery did not support Counsel for the *Meserole*

Plaintiffs' attributions to the confidential sources.  Indeed, although they had notified

Defendants by letter on March 11, 2010 that they would strike all allegations relating to

the confidential sources, on March 26, 2010 Counsel for the *Meserole* Plaintiffs

submitted a memorandum to the Court, stating that the testimony of Confidential Source

#1 supported the allegations in the SAC.  The mere fact that the Defendants had chosen

not to file their motion for sanctions with the Court – a decision that may have been

motivated by any number of reasons – is insufficient, in and of itself, to place this case

within the purview of the heightened standard of bad faith.  Here, where Counsel for the

*Meserole* Plaintiffs were given ample notice and refused to strike the challenged

allegations, and where they contended that the challenged allegations had evidentiary

support as late as March 26, 2010, and where they delayed for over forty-five days

beyond the safe harbor provision before entering the stipulation to strike the allegations,

the Court concludes that it is appropriate to apply to Counsel for the *Meserole* Plaintiffs'

behavior the standard "objectively unreasonable" *mens rea* requirement to this case.

**B. Application to the Facts**

The first question is whether Counsel for the *Meserole* Plaintiffs were objectively

unreasonable in including the allegations about the confidential sources in drafting the

---

[9] Rather, as the opinion discusses more fully *supra*, Counsel for the *Meserole* Plaintiffs agreed to withdraw none of the challenged allegations within the safe harbor period, because the purported agreement to withdraw the Confidential Source #1 allegations was meaningless because Counsel for the *Meserole* Plaintiffs also insisted that the sole quote attributed to Confidential Source #1 should instead be attributed to Confidential Source #2.

SAC.  The mere fact that the confidential sources testified, subsequent to the submission of the SAC, in a manner contradictory to the statements attributed to them in the SAC is not sufficient evidence to establish that Counsel for the *Meserole* Plaintiffs acted in an objectively unreasonable manner; the apparent contradictions might just as easily be attributable to the confidential sources' changing or refreshed recollections.  Counsel for the *Meserole* Plaintiffs submitted a declaration, not of the in-house investigator who had conducted the interviews of the two confidential sources, but instead from one of the attorneys, generally describing the attorney supervision of the investigative process.  (Leigh Smith Decl. ¶¶ 7, 15-21.)  That declaration contends that an in-house investigator conducted thorough interviews, and met with the confidential sources on more than one occasion.  (*Id.*)  The confidential sources, however, both testified in their depositions that they were contacted by lawyers – or, at least, by individuals who held themselves out as lawyers.  (Transcript (Jan. 28, 2010) at 25; Transcript (Jan. 29, 2010) at 41, 57.)  When asked about the interviews with the lawyer (or investigator), Confidential Source #2 testified that the questioner never asked him whether the contaminated optical blocks were sent to consumers and that the questioner was "jumping to conclusions."  (Transcript (Jan. 28, 2010) at 41.)  Similarly, Confidential Source #1 testified that he was "just as cloudy" about the details at the Sony plant when he spoke with the "attorney" as he was during his deposition – that is, he struggled to remember dates and had no memories of replacing optical blocks in the XBR2 televisions that were the subject of the *Meserole* SAC.  (Transcript (Jan. 29, 2010) at 60.)  Moreover, Confidential Source #2 was very clear that there were problems with the optical blocks, but further questioning quickly revealed that the only optical block problems that he knew about involved the

earlier problems and could not have caused the problems with the models that are the subject of the SAC and the Consolidated Amended Class Action Complaint.  (Transcript (Jan. 28, 2010) at 11-12, 29-34.)

In light of these numerous discrepancies between the pertinent allegations in the complaints and the confidential sources' deposition testimony, and in light of the testimony of the confidential sources about the nature and content of their prior interviews with the investigator or lawyers who contacted them, the Court concludes that there were substantial flaws in the investigative work conducted prior to the filing of the SAC and in the supervision of that work.  This is particularly troubling as these allegations were material to Plaintiffs' consumer fraud claims.  The Court is mindful, however, that it must "strive to avoid the wisdom of hindsight in determining whether a pleading was valid when signed," and therefore concludes that though the investigation was flawed, there is no direct evidence submitted upon which to make that conclusion. *Eastway Constr. Corp.*, 762 F.2d at 254.  Similarly, since no affidavits based on personal knowledge of attorney oversight were filed by Counsel for the *Meserole* Plaintiffs, there was no direct evidence in the record before the Court to conclude that the attorneys' oversight of pre-filing investigation was objectively unreasonable.  However, the failure to submit such affidavits is indirect evidence of inadequate investigation and attorney supervision.

A separate issue is whether Counsel for the *Meserole* Plaintiffs were objectively unreasonable when they attributed a statement in the SAC to Confidential Source #1 without clarifying that that statement was describing the situation in 2005, i.e. before the televisions that are the subject of these actions were sold in the fall of 2006, as alleged in

paragraph 23 of the SAC.  In their responsive papers, Counsel for the *Meserole* Plaintiffs

allege that, in his initial investigative report, Confidential Source #1 told the investigator:

"In 2005, if Sony sent out one million television sets, they got one million back.  Every

single television that left that plant was bad and they knew it."[10]  (Leigh Smith Decl. ¶

17.)  Only the latter half of this quotation was included in the SAC, thus eliminating any

indication that the statement referred only to 2005.  (SAC ¶ 22.)

In their responsive papers, Counsel for the *Meserole* Plaintiffs recount that

Confidential Source #1, elsewhere in the investigator's initial memorandum, "expanded

the timeframe for problems associated with the televisions' optical blocks and stated . . .

[that] from 2005 to 2007, retail stores were returning unsold televisions to Sony."  (Leigh

Smith Decl. ¶18)  Counsel for the *Meserole* Plaintiffs next stated in their responsive

papers:

> 19. Counsel specifically requested that the Investigator re-
> interview CS 1 to make certain that there was adequate support for
> the allegations attributed to CS 1 in the Complaints.
> 20. During the second interview, the Investigator asked follow-
> up questions to confirm Counsel's understanding of key details
> including the television model numbers based upon which CS 1's
> statements, which were contradicted by his later testimony when
> deposed, were based.
> 21. During the second interview, CS 1 confirmed that his prior
> statements regarding the optical blocks were applicable to the
> televisions at issue in this case.  CS 1 confirmed, in response to the
> Investigator's further inquiries, that the optical block problems
> affected 'models KDS-R60XBR2, KDS-R70XBR2, KDS-
> 50A200[0], and KDS-60A200[0].' . . . When asked for
> confirmation, he stated: 'It was all of them.  All of them that had
> the optical blocks in them were defective.' (*Id.* ¶¶ 19-21.)

---

[10] This is significant because any television sold in 2005 were models that would not be covered by the
*Meserole* Plaintiffs' class action.

These paragraphs indicate that this part of the investigation occurred after the SAC was filed.  Although from this account it is not clear what Confidential Source #1 was being asked to confirm, Counsel for the *Meserole* Plaintiffs apparently determined not to change the allegations attributed to Confidential Source #1 in the complaints.

At his deposition, Confidential Source #1 was able to state firmly and on the basis of actual knowledge that in 2005, he believed that every television that left the plant had a problem with the optical block.  (Transcript (Jan. 29, 2010) 15.)  However, he testified at his deposition that he had nothing to do with optical blocks, at least as of February of 2006 and possibly even earlier, and concluded by testifying that the problems with the optical blocks concluded at the latest in January or February of 2006.  (*Id*. at 28.)  He also testified that he heard rumors about some problems with the optical blocks in 2006 and 2007, but had no personal knowledge about any problems.  (*Id*. at 67.)  Confidential Source #1 did not state, at his deposition or to the investigator, that in 2006 and 2007, Sony knowingly sold television sets containing defective optical blocks.  By deleting the first sentence attributed to Confidential Source #1 in the first investigative memorandum, Counsel for the *Meserole* Plaintiffs misrepresented what Confidential Source #1 had said and, by filing the SAC, they misled this Court.  This was objectively unreasonable. Counsel for the *Meserole* Plaintiffs violated Rule 11(b)(3).

The next issue is whether Counsel for the *Meserole* Plaintiffs' failure to timely withdraw the challenged factual allegations from the SAC is sanctionable.  On March 5, 2010, the last day of the safe harbor period, Counsel for the *Meserole* Plaintiffs responded to the motion for sanctions by agreeing to strike the allegations attributable to one of the confidential sources, but then asserting that the sole allegation attributable to

that confidential source should instead be attributed to the other confidential source
whose testimony they had not agreed to strike.  This did not cure the problems that had
been identified by the Defendants in the aftermath of the depositions of the confidential
sources, nor did it cure the misrepresentations resulting from the out-of-context quotation
attributed to Confidential Source #1 in the Second Amended Complaint that "every
television that left that plant was bad and they knew it."  Several days later, it was the
Defendants, rather than Counsel for the *Meserole* Plaintiffs, who alerted the Court that
the deposition testimony of the confidential sources was at odds with the statements
attributed to them in the SAC.  (Def. Mem. Mot. for Prelim. Approval at 17-24.)   On
March 11, 2010, Counsel for the *Meserole* Plaintiffs agreed in correspondence with the
Defendants that they would strike all the confidential source allegations.  (Exhibit 2 to
June 4, 2010 Letter from Defendants to the Court.)  Nevertheless, as late as March 26,
2010, Counsel for the *Meserole* Plaintiffs filed motion papers supporting the confidential
sources allegations in the SAC.  (Pl. Opp. to Mot. for Prelim. Approval at 22-23.)  And it
was not until April 21, 2010 – forty-eight days after the lapse of the safe harbor
provision, not within the safe harbor provision as claimed in the Smith Declaration – that
Counsel for the *Meserole* Plaintiffs struck the allegations.  This delay was unreasonable.
As soon as the depositions finished, it should have been immediately apparent to Counsel
for the *Meserole* Plaintiffs that their allegations about the confidential sources were at
odds with the testimony of the confidential sources.[11]  Furthermore, their own

---

[11] This is especially true given that the transcripts of the deposition suggests that all parties were aware of
this during the deposition.  Indeed, much of the Defendants' questioning focused on what was said to the
investigator and whether the problems described by the confidential sources approximated the optical block
problems described in the SAC.  Moreover, because some of the lawyers for Plaintiff Meserole were
counsel in the previous class action concerning the 2005 models, these lawyers should have immediately

investigator's memorandum demonstrated that they had used a highly misleading quotation of Confidential Source #1.  All told, just under twelve weeks passed between the date of the second deposition and the filing of the stipulation to strike these allegations; just under six weeks passed between the date of the second deposition and the date when Counsel for the *Meserole* Plaintiffs agreed to strike these allegations.

This delay was unreasonable under the high professional standards expected by this Court and embodied in Rule 11.  The deposition was not particularly lengthy, and Counsel for the *Meserole* Plaintiffs do not suggest that the delay was due to the need to review lengthy transcripts or other evidence or that other burdens of counsel prevented such a review.  Indeed they cannot, because lawyers from three different firms jointly filed these pleadings.  They offer no explanation for the delays, except that "Counsel were engaged in a discussion with Sony's counsel about whether CS 1's testimony supported the allegations in the Complaints."  This is not enough to excuse such substantial delay.  The delay was objectively unreasonable.

## III. Sanctions

Defendants have requested attorney's fees, however Rule 11(c)(4) limits the award of attorney's fees to sanctions imposed pursuant to a motion.  *Nuwesra v. Merrill Lynch, Fenner & Smith, Inc.*, 174 F.3d 87, 94 (2d Cir. 1999).  Here, where the Defendants did not file their motion with the Court, attorney's fees are not available.

A sanction "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated."  Fed. R. Civ. P. 11(c)(4).  A reprimand

---

known that the testimony of the confidential sources about the 2005 manufacturing defects was irrelevant to the instant action.

is an appropriate sanction where there has been no showing of bad faith, and where the parties are sufficiently concerned with their professional reputation that a public reprimand will have the intended effect of deterring future wrongdoing. *See Corp. Printing Co. v. N.Y. Typographical Union Local 6*, 886 F. Supp. 340, 348 (S.D.N.Y. 1995). Here, no more is necessary than to reprimand Milberg LLP, by Leigh Smith, Sanford Dumain and Jennifer Czeisler, Lax LLP, by Robert Lax, and Lange & Koncius LLP, by Joseph Lange and Jeffrey Koncius for failure to comply with the high professional standards expected by the Court, namely for their objectively unreasonable joint actions: (1) attributing a statement to a former Sony employee but eliminating the context necessary to make it accurate at the time the SAC was filed, and (2) refusing to strike allegations that were unsupported by the testimony of the people they purported to quote until long after the lapse of the safe harbor period. Rule 11 and its safe harbor provision are expected to be strictly observed by all attorneys and responded to in a forthright manner without foot-dragging.

IT IS SO ORDERED.
Dated: New York, New York
July **2 /**, 2010

Robert P. Patterson, Jr.
U.S.D.J.

25

**Copies of this order were faxed to:**
Leigh Smith, Jennifer S. Czeisler, Sanford P. Dumain: **212-868-1229**
Milberg LLP
One Pennsylvania Plaza
New York, NY 10119

Jeffrey Alan Koncius, Joseph Jude Morgan Lange: **310-414-1882**
Lange & Koncius, LLP
222 No. Sepulveda Blvd., Suite 1560
El Segundo, CA 90245

Robert Ian Lax: **212- 818-1266**
Robert I. Lax & Associates
380 Lexington Avenue
31st Floor
New York, NY 10168

Richard Irving Werder, Jr., Katie McKenzie Anderson: **212-849-7100**
Quinn Emanuel Urquhart Oliver & Hedges LLP
51 Madison Avenue
New York, NY 10010

John Purcell: **213 -443-3100**
Quinn Emanuel Urquhart Oliver & Hedges LLP
865 South Figueroa Street, 16th Floor
Los Angeles, CA 90017

William Bernard Federman , Jennifer Faith Sherrill: **(405) 239-2112**
Federman & Sherwood
10205 North Pennsylvania Ave.
Oklahoma City , OK 73102

Kim Eleazer Richman: **(212) 687-8292**
875 Sixth Avenue, Suite 1808
New York , NY 10001

Michael Robert Reese: **(212) 253-4272**
Reese Richman LLP
230 Park Avenue
10th Floor
New York , NY 10169