UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
IN RE: SONY CORP. SXRD REAR PROJECTION
TELEVISION MARKETING, SALES PRACTICES
AND PRODUCTS LIABILITY LITIGATION

09-MD-2102 (RPP)
**OPINION AND ORDER**

------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

Following the Court's preliminary approval of the proposed settlement on May

19, 2010, and in advance of the fairness hearing held on August 13, 2010, Plaintiff

Cardenas and Defendants separately moved for certification of the proposed class, final

approval of the proposed class action settlement in this matter.  Having reviewed the

parties' submissions, along with the objections to the Court, and having heard testimony

and argument at the August 13, 2010 fairness hearing, the Court: (1) certifies the

proposed class; (2) approves the class action settlement; and (3) awards attorney's fees to

class counsel.


**I. FACTS AND PROCEEDINGS**

In October 2008, Paul Meserole commenced the first of the class actions,

concerning defective optical blocks in second generation SXRD rear projection television

sets manufactured and sold by Sony, which was subsequently consolidated by the Panel

for Multidistrict Litigation with six other class action lawsuits.  While not immediately

apparent to the purchaser, the defects allegedly cause various color anomalies and

discolorations to manifest themselves over time and "severely interfere with the program

display."  (Meserole Compl. ¶ 3.)

Plaintiff Sabrina Cardenas filed a complaint in the Eastern District of Texas in June 2009, making similar – and some identical – allegations to those contained in the initial complaint brought by Plaintiff Meserole.  In November 2009, Plaintiff Cardenas and Defendants announced, after informal discovery and discussions mediated by retired Judge Glenn Ashworth, a JAMS mediator in Dallas, that they had agreed upon terms to a class action settlement.  (Letter to the Court from Sony and Plaintiff Cardenas, Nov. 12, 2009.)

Following formal confirmatory discovery, Plaintiff Cardenas and the Defendants separately moved for preliminary approval of the settlement, which the Court granted after three days of hearing and argument in April and May 2010.  In re Sony Corp. SXRD Rear Projection Television Marketing, Sales Practices and Products Liability Litigation, 09 MD 2102, 2010 WL 1993817 (S.D.N.Y. May 19, 2010).  The Court's May 19, 2010 order: (1) preliminarily certified the proposed class, for purposes of settlement only; (2) preliminarily approved the class settlement; (3) named the law firm of Federman & Sherwood, counsel for Plaintiff Cardenas, as class counsel; (4) approved the notice to the class and ordered the dissemination thereof by mail and publication; (5) stayed proceedings in all related cases; and (6) scheduled the August 13, 2010 fairness hearing. Id.

## II. CLASS CERTIFICATION

Plaintiff Cardenas moves the Court to certify as a class, for settlement purposes only:

> All individuals who purchased, or received as gifts, second generation Sony Grand WEGA SXRD rear projection HDTV televisions bearing the

model designations KDS-R60XBR2, KDS-R70XBR2, KDS-50A2000/2020/3000, KDS-55A2000/2020/3000, KDS-60A2000/2020/3000 and KDS-70Q006. Excluded from the Settlement Class are: Sony, its affiliates, and their employees and immediate family members; persons who purchased or acquired a Television for commercial use or resale; persons who are claims aggregators; and persons who claim to be an assignee of rights associated with the Televisions.

(Plaintiff Sabrina Cardenas' Memorandum in Support of Motion for Final Approval of Class Action Settlement and Response to Opposition to Proposed Class Action Settlement and Request for Attorneys' Fees ("Pl. Mem."), 10-11.) Certification of a class is appropriate if the proposed class meets the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure – numerosity, commonality, typicality, and adequacy of representation – and if "parties seeking class certification . . . show that the action is maintainable under Rule 23(b)(1), (2), or (3)." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 614 (1997).

*Numerosity*: Rule 23(a)(1) of the Federal Rules of Civil Procedure requires that a class be "so numerous that joinder of all members is impracticable." The proper inquiry is whether such joinder is impracticable, not whether it is impossible. Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993). In its submissions to the Court, Sony has represented that 352,022 televisions sets covered by the class were sold. (Letter to Court from Sony, Aug. 10, 2010.) With a class of this size, joinder would be impracticable.

*Commonality and Typicality*: Rule 23(a)(2) of the Federal Rules of Civil Procedure permits certification of a class only if "there are questions of law or fact common to the class." Rule 23(a)(3) of the Federal Rules of Civil Procedure requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." The Second Circuit has explained:

> The crux of both requirements is to ensure that maintenance of a class action is economical and [that] the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact. Typicality, by contrast, requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.

Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997) (internal quotations and citations omitted). Here, the models of television sets covered by the proposed class are all rear-projection high definition televisions. These television models use a form of technology known as an optical block, which has failed or degraded in a number of the class members' television sets over time. The problems described by the class members in their letters to the Court have been similar, if not identical, to those alleged in Plaintiff Cardenas' complaint, namely, "yellow stains, green haze, and other color anomalies" that "severely interfere[e] with the program display." (Cardenas Compl. ¶ 1.) These common facts have given rise to common questions of law, concerning the extent to which Sony made misrepresentations to consumers and whether the two year warranty of the optical block or an implied warrant covers the instant problems. Therefore, the Court concludes that both the commonality and typicality requirements of Rule 23(a) are met by the proposed class.

*Adequacy*: Rule 23(a)(4) of the Federal Rules of Procedure requires that "the representative parties . . . fairly and adequately protect the interests of the class." Plaintiff Cardenas became involved in this lawsuit when her television developed the color anomalies complained of by other members of this class. (Cardenas Compl. ¶ 4; Transcript, Apr. 23, 2010 ("Apr. 23 Tr."), 10.) Her counsel has ably represented her

4

interests and those of the rest of the class during extensive settlement negotiations, confirmatory discovery, and the settlement approval process.  (Apr. 23 Tr. 10-26, 32-36.) On this basis, the Court concludes that Plaintiff Cardenas "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).

*Rule 23(b)*: Separate and apart from the Rule 23(a) requirements, the Court must determine whether the action falls within one of three "types of class actions," as described in Rule 23(b) of the Federal Rules of Civil Procedure before it may certify the case.  Amchem Products, Inc., 521 U.S. at 614.  Plaintiff Cardenas contends that this class falls within the third category of class action in that it is one where "the questions of law or fact common to class members predominate over any questions affecting only individual members" and where "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."   Fed. R. Civ. P. 23(b)(3).  In determining whether the requirements of Rule 23(b)(3) have been met, the Court must consider: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and (4) "the likely difficulties in managing a class action."  Amchem Products, Inc., 521 U.S. at 623.

Because of the small size of potential claims, no more than a portion of the cost of the purchased television, the class members' interest in "individually controlling the prosecution . . . of separate actions" is minimal, and is substantially outweighed by the conveniences of aggregating claims.  While there is a single separate class action lawsuit

being brought under California consumer protection statutes in California, which has been stayed, there is nothing in the record before the Court to suggest that a significant number of individual lawsuits has been brought. After due consideration, the Multidistrict Panel on Litigation decided to consolidate these related cases here, in the Southern District of New York, in part because this Court had been the forum for prior litigation against Sony concerning the first generation of television sets that are the subject of this action and because five of the seven pending class actions were brought in this district, before this judge. Finally, because the claims of the class members are straightforward and because the confines of the class are well drawn, the class, despite its size, presents no substantial difficulties. In light of these factors, the Court concludes that the proposed class is sufficiently cohesive, i.e. that "questions of law or fact common to class members predominate," and the Court concludes that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed R. Civ. P. 23(b)(3).

For the reasons discussed above, the proposed class meets the requirements of Rule 23 of the Federal Rules of Civil Procedure. The Court therefore certifies the class for settlement purposes.

## III. FAIRNESS OF THE SETTLEMENT

"If the propos[ed settlement] would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable and adequate." Fed. R. Civ. P. 23(e)(2). Such a finding must be premised both on a finding that negotiation process leading up to the settlement was fair and a finding that the terms of the settlement are

substantively fair.  Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 116 (2d Cir. 2005).

**A. Terms of Settlement**

The benefits of the settlement, as negotiated, are: (1) the extension of the limited warranty for models KDS-50A2000, KDS-55A2000, KDS-60A2000, KDS-R60XBR2, KDS-R70XBR2, and KDS-70Q006 until August 31, 2010; (Settlement Agreement ¶ 4.2.1) (2) the extension of the limited warranty for models KDS-50A2020, KDS-55A2020, and KDS-60A2020 until December 31, 2010; (Id.) (3) the extension of the limited warranty for models KDS-50A3000, KDS-55A3000, and KDS-60A3000 until July 31, 2011; (Id.) (4) the creation of a "dedicated team of technical representatives to handle telephone calls to the dedicated toll-free number under the Warranty Extension"; (Id. ¶ 4.3.2) (5) reimbursement for any "reasonable out-of-pocket expense incurred prior to the termination date of the Warranty Extension" to repair the optical block; (Id. ¶ 4.4.1) (6) reimbursement of the purchase price of an extended service plan from Sony after October 1, 2008 and prior to the effective date of the settlement; (Id. ¶ 4.5.1) and (7) reimbursement of any money "paid to Sony prior to the Effective Date in connection with Sony's customer service staff accommodating an . . . 'upgrade'." (Id. ¶ 4.6.1.) Additionally, Sony paid for the provision of notice to class members.  (Id. ¶ 4.7.)

At the August 13, 2010 fairness hearing, Timothy McGowan, vice president of service engineering at Sony, testified extensively about the engineering fixes that had been put in place to improve the optical blocks over the SXRD I televisions and periodically thereafter.  Sony engineers installed additional UV filters and increased the strength of the UV filters at the front of the optical block.  (Transcript, Aug. 13, 2010

("Aug. 13 Tr."), 21-32.)  Sony engineers also re-engineered the manufacturing process of

the optical block's LCD panel to reduce contamination and changed the voltage on the

LCD panel.  (Id., 33.)  McGowan further testified that after Sony implemented these

fixes, he "saw [a] great decline [in] failure rates for optical blocks, specifically for these

symptoms."  (Id., 36.)

**B. Procedural Fairness**

A settlement is procedurally fair if: (1) the settlement is a product of "arms'-

length negotiations"; (2) during negotiation, both sides were represented by "experienced,

capable counsel"; and (3) it was reached after conducting "meaningful discovery."  Wal-

Mart Stores, Inc., 396 F.3d at 116 (citing MANUAL FOR COMPLEX LITIGATION THIRD, §

30.42 (1995)).

Here, the Court already concluded that the settlement was a product of "arms'-

length negotiations," in its May 19, 2010 opinion:

> While the counsel for the Meserole plaintiffs have made many
> insinuations and statements about the inadequacy or inappropriateness of
> counsel for plaintiff Cardenas, they have pointed to no evidence or
> documentation showing that the negotiations between the Defendants and
> counsel for plaintiff Cardenas were collusive. Indeed, at the hearing held
> on April 23, 2010, counsel for plaintiff Cardenas represented: (1) that
> his law firm became involved in this case when approached by Ms. Cardenas
> and her lawyer, Cornelius Dukelow of the Abington Intellectual Property
> Law Group, Transcript of Apr. 23, 2010 hearing ("Apr. 23 Tr."), at 10; (2)
> that the law firm had no contact with Sony before beginning settlement
> negotiations with counsel for Sony in "September or October" of 2009, Id.
> at 11; (3) that after consulting with plaintiff Cardenas and Mr. Dukelow,
> the firm began settlement negotiations with counsel for Sony, Id. at 12; (4)
> that the firm consulted with Dr. Sohail Dianat, a professor at the Rochester
> Institute of Technology who is an electrical engineer, specializing in
> monitors and televisions, Id.; Letter from William Federman to the Court
> (May 10, 2010); (5) that the firm consulted with William Rubenstein, a
> professor of consumer law at Harvard Law School, Apr. 23 Tr. at 13;
> Letter from William Federman to the Court (May 10, 2010); (6) that
> negotiations lasted six months, and that there was extensive "back and

forth" over the terms of the settlement, Apr. 23 Tr. at 15; and (7) that the firm engaged in extensive confirmatory discovery, including seven transcribed interviews, two depositions, and 19,000 pages of documents reviewed, Defendants' Mem. of Law, at 19. On the record before the Court, there is no evidence or documentation that contradicts this account of the negotiations. The Court therefore finds, as a preliminary matter, that the negotiations were not collusive and were conducted at arms length.

In re Sony Corp. SXRD Rear Projection Television Mktg., Sales Practices and Prod. Liab. Litig., No. 09 MD 2102, 2010 WL 1993817,  at *3 (S.D.N.Y. May 19, 2010). Furthermore, the parties engaged in mediation with the Honorable Glen Ashworth, a retired judge and JAMS mediator in Dallas, Texas.  Based on the record before the Court, there is nothing to disturb these factual findings.  Therefore, the Court concludes that the settlement was the product of "arms'-length negotiations."[1]

During negotiations, Plaintiff Cardenas was represented by William Federman, of the law firm of Federman & Sherwood, and Cornelius Dukelow, of the Abington Intellectual Property Firm.  Federman has twenty-eight years experience as a trial lawyer, including experience representing clients in appeals heard by the United States Supreme Court and litigating class action lawsuits.  He has served as lead or co-lead counsel in a

---

[1] The Meserole Plaintiffs, in their objection to this Court, contend that the settlement was collusive, and cite two cases to support their contention.  (Opposition of Paul Meserole, et al., to Proposed Class Action Settlement and Request for Attorneys' Fees ("Opp."), 3-6.)  However, both cases relied upon by Plaintiff Meserole et al. are inapposite.  In the first, Reynolds v. Beneficial National Bank, the Seventh Circuit concluded that the settlement process was likely collusive where three lawyers, none of whom had pending suits or even clients, lunched with defense counsel discussed settlement and apparently made a tentative agreement as to the monetary value of such a settlement, before "buying" a client from another lawyer, bringing suit against Defendants, and settling for the agreed upon figure.  288 F.3d 277 (7th Cir. 2002). None of those facts – or any other facts suggesting a "reverse auction" or other collusion – is present here. In the second case relied upon by the objectors, Figueroa v. Sharper Image Corp., the settlement was opposed by the Attorneys General of thirty-six states, based in great part on their concern that the "coupon settlement" would not provide meaningful compensation to class members.  517 F. Supp. 2d 1292, 1301-02 (S.D. Fla. 2007).  The Court there concluded that the counsel or plaintiffs were at a substantial disadvantage during settlement negotiations, as evidenced by how far the substantive terms of the settlement differed from the plaintiffs' proposed terms, and that this tainted the entire settlement negotiations.  Id. At 1321-23.  Here, the settlement negotiations reveal no such substantial weakness on the part of Plaintiff's counsel.  Rather, it appears that Plaintiff's counsel used the framework of the SXRD I settlement as a foundation and suggested additional terms, after consulting with various experts, that would provide more relief to class members, and that these terms were accepted by Sony.  (Apr. 23 Tr. 12, 16.)

number of matters in this district and in trial courts across the country.  (Ex. 3 to Plaintiff Sabrina Cardenas' Memorandum in Support of Plaintiff's Application for an Award of Attorneys' Fees and Reimbursement of Expenses ("Pl. Fee Mem.").)  Dukelow has a decade of experience litigating cases involving patent and technology issues.  (Aug. 13 Tr., 25.)  During negotiations, they were advised by a professor of consumer law, at Harvard Law School, and a professor of electrical and microelectrical engineering, at the Rochester Institute of Technology.  Sony was represented, during negotiations, by lawyers at the law firm of Quinn Emanuel Urquhart & Sullivan, LLP.  Thus, the Court concludes that Plaintiff and Defendants were well represented by "experienced, capable counsel" during settlement negotiations.

Finally, the parties engaged in substantial confirmatory discovery as a part of the ongoing settlement negotiatons.  Sony produced "approximately 19,000 pages of documents."  (Aug. 13 Tr., 9.)  Sony produced seven witnesses for interviews.  (Id.)  And the parties deposed the two "confidential sources" relied upon by the Meserole papers in the Second Amended Complaint.  (Id.)  Following the conclusion of this confirmatory discovery, Plaintiff and the Defendants signed a settlement agreement.  Therefore, the Court concludes that the settlement was reached following extensive discovery.

For the reasons stated above, the Court finds that negotiation process leading up to the settlement was fair.

**C. Substantive Fairness**

In City of Detroit v. Grinnell Corp., the Second Circuit outlined a number of factors that a court must consider in evaluating whether the substantive terms of a settlement are fair and adequate.  495 F.2d 448 (2d Cir. 1974).  Above all else, the

Second Circuit emphasized that a court must consider "the strength of the case for the plaintiffs on the merits, balanced against the amount offered in settlement." Id., at 455. With this in mind, the Second Circuit directed courts to consider nine factors: "(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." Id. (citations omitted).

    *Complexity, expense, and duration of litigation*: The first of the lawsuits consolidated herein was brought in October 2008.  The first amended complaint filed in Meserole was dismissed by the Court for failure to state a claim upon which relief could be granted.  Meserole v. Sony Corp. of America, Inc., 08 CV 8987, 2009 WL 1403933 (S.D.N.Y. May 19, 2009).  Plaintiff Meserole subsequently filed a second amended complaint.  The Defendants have moved to dismiss this complaint, along with the operative complaints in the four related actions filed by the same counsel.  If this case were to proceed, it would face either dismissal or years of litigation and discovery, with all the attendant costs.  Therefore, the Court concludes that this factor weighs in favor of approving the settlement.

    *Reaction of class*: Of a class consisting of over 352,000 members, eighty-three have opted out of the class and twenty have objected.  (Aug. 13 Tr. 4.)  Opt-outs and

objectors constitute a miniscule percentage of the class.[2]  The objectors have opposed the
length of warranty extension and have commented that there is no "fix" to this problem.
(Opp., 1-3.)  While the objectors raise substantive objections to the settlement, the
Defendants introduced evidence at the hearing and in written submissions to the Court
that suggest that the optical block fix has been successful in the vast majority of
televisions where it has been implemented and that the final product has been within the
normal range of failure for television sets.  (Aug. 13 Tr., 36, 50; Letter to Court from
Sony, Aug. 10, 2010.)  More relevant here, however, is the fact that the objectors and opt-
outs constitute a miniscule percentage of the total class.  Therefore, the Court concludes
that, on balance, this factor weighs in favor of approving the settlement.

> *Stage of the proceedings and amount of discovery completed*: As noted above, the
first amended complaint in the Meserole action was dismissed.  Currently, motions to
dismiss are pending in each of the related actions.   Defendants have produced 19,000
pages of documents concerning the engineering fix, customer complaints, failure rates,
repairs, and aging studies of the optical blocks.  (Aug. 13 Tr., 9; Defendants'
Memorandum in Support of Motion for Final Approval of Class Action Settlement ("Def.
Mem."), 15.)  Counsel for Cardenas and the Meserole Plaintiffs participated in interviews
and depositions of nine current and former Sony employees.  (Aug. 13 Tr., 9.)  Both the

---

[2] Sony has mailed notice of the fairness hearing to over 50,000 class members who registered their
purchases with Sony, of which over 44,000 were successfully delivered.  (Letter to the Court from Sony,
Aug. 10, 2010.)  Sony has also set up a website with notice of the Settlement, which had had 17,637 unique
visitors, as of August 1, 2010.  (Id.)  Additionally, Sony published notice of the settlement in the Wall
Street Journal and USA Today.  There are only eighty-three opt-outs, of whom thirty-five are California
residents who may be members of the class in the action being brought in California state courts.  Only
twenty objections have been filed, of which thirteen are part of the Meserole group, whose counsel are
Plaintiffs' counsel in the California state court action.  (See Opp.)

pending motions to dismiss and the extensive discovery already conducted on behalf of the class weigh in favor of approval of the settlement.

*Risks of establishing liability, establishing damages, and maintaining the class action through trial*: The Court granted Sony's motion to dismiss the first amended complaint in the <u>Meserole</u> case, for failure to state a claim.  Since then, the <u>Meserole</u> Plaintiffs have filed a second amended complaint – a version of which was filed in many of the related actions.  However, the <u>Meserole</u> Plaintiffs agreed to strike portions of the complaint containing statements attributed to two former Sony employees, which purported to show that, prior to marketing the television models which are the subject of these actions, Sony had knowledge that the optical blocks contained the defect, when discovery authorized by the Court did not support these allegations.  Sony has filed and fully briefed motions to dismiss in all related cases.  Rather than rule, in anticipation, upon these motions, the Court simply notes that the Plaintiffs face substantial obstacles to establishing liability and damages.  Separately, as noted above, the costs of maintaining the class action through trial are substantial.  Therefore, the Court concludes that the risks of continuing, rather than settling, this action are substantial.

*Ability of the defendants to withstand a greater judgment*:  Sony is a large, multinational company.  Defendants appear to concede, in their papers, that they could withstand a greater judgment, but note that "Defendants have calculated that this settlement bears significant monetary cost to the Defendants."  (Def. Mem., 19.)  In a letter sent to the Court, upon the Court's request at the August 13 hearing, which is attached hereto, the Defendants estimate that at a minimum the proposed settlement will cost Sony roughly seven million dollars.  (Letter to Court from Sony, Aug. 18, 2010.)

The Court concludes, therefore, that this factor weighs neither against nor in favor of approval of the settlement.

 *Range of reasonableness of the settlement fund in light of the best possible recovery and all the attendant risks of litigation*: While the Plaintiffs and class members face many possible obstacles to recovery, if this litigation continues, the proposed settlement offers real relief to class members whose television sets have malfunctioned due to a defective optical block.  The extensions of the warranty have added months of full coverage for class members and will continue to add months for class members who own the later models.  For those class members who purchased an extended service plan from Sony that has been made redundant by the extensions of the warranty, the Defendants will refund the cost of that plan.  Additionally, if there is any delay in the replacement of their optical blocks or if the class members experience problems subsequent to receiving a replacement optical block, class members will be entitled to a cash payment from Sony, ranging from $200 to $700, depending on the model.  Any class members who paid out-of-pocket for repairs of their optical blocks will be reimbursed those expenses, as will any class members who paid Sony to upgrade to a new television set.  These benefits are meaningful and address the problems experienced by class members.  In light of the substantial litigation risks, outlined above, and the obstacles facing these lawsuits should they proceed, the settlement offers benefits to the class members that are reasonable, fair and adequate.

 Based on its consideration of the Grinnell factors, the Court finds that the terms of the settlement are fair, reasonable, and adequate.  Therefore, the Court grants final approval to the settlement.

### IV. ATTORNEY'S FEES

The Second Circuit has held "that both the lodestar and the percentage of fund methods are available to district judges in calculating attorneys' fees in common fund cases."  Goldberger v. Integrated Res., Inc., 209 F.3d 43, 50 (2d Cir. 2000).  The Second Circuit has emphasized, however, that regardless of whether a district court looks to the lodestar method or the percentage of fund method, "district courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee, including: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations."  Id. (internal quotation marks and citations omitted).

Here, class counsel has submitted records for itself and for the Abington Intellectual Property Law Group showing that the total number of hours expended on this matter, by attorneys and paralegals, is 1102.85. (Ex. 1-2 to Pl. Fee Mem.)  Those hours, billed at the firms' current rates, amounted to $608,391.25 as a lodestar amount.  (Id.)  Class counsel has submitted records showing $33,567.77 in expenses.  (Id.)  At the fairness hearing, class counsel indicated that it had overlooked a $15,000 fee, attributable to one expert who assisted them in settlement negotiations.  (Aug. 13 Tr., 24.)  Class counsel also indicated that they would not be requesting fees for labor expended in managing and administering the settlement.  (Id., 25.)  Thus, expenses and the lodestar figure amount to $641,959.02, which is greater than the $625,000 that the Defendants agreed to pay class counsel for fees and expenses.

As noted throughout this opinion, the litigation was substantial and complex. With a class containing over 350,000 members, and with the substantial challenges raised by plaintiffs raised in related actions, this litigation qualifies as complex.

Likewise, as noted above, this litigation involved substantial risks – both in establishing liability and in determining damages.

Class counsel has extensive experience litigating large class action suits, albeit little in consumer class actions.  (Ex. 3 to Pl. Fee Mem.)  In the proceedings before the Court, class counsel has demonstrated a facility with the law, and, by use of experts for supplementary advice, a dedication to the interests of class members.   The Court therefore concludes that the representation provided to class members by class counsel has been of high quality.

Sony has calculated that the settlement benefits will cost Sony roughly seven million dollars.  (Letter to Court from Sony, Aug. 18, 2010.)  Specifically, they calculate that the costs incurred for the warranty extension, excluding the costs of warranty extensions granted to class members prior to the settlement, will amount to $6,845,614.60.  (Id.)    Sony estimates that the costs of reimbursing covered extended service plan purchases will amount to $14,415.22.  (Id.)  Sony estimates that the costs of reimbursing covered upgrade expenses will amount to $13,218.24.  (Id.)  Sony does not have an estimate for the cost of reimbursing class members for out-of-pocket expenses for optical blocks, as the total number of these claims is not yet known, although Sony has already received claims for reimbursement that "could exceed $200,000."  (Id.) Alternatively, Defendants calculated the benefit to the class, using a method similar to that used by the Plaintiffs in the SXRD I litigation, taking the two year warranty

extension price to the customer to arrive at a monthly cost for a warranty on all repairs, and reducing that cost by 60% to calculate the cost of the optical block monthly extension and then multiplying that by the remaining months of warranty provided to the class by the Cardenas negotiations.  (Id.)  By this method, they determined that the total cost of the warranty extensions, if they had been purchased via extended service contract, would be $15,905,818.80.  (Id.)

The requested fee, $625,000, was a number reached by the parties after participating in a mediation overseen by a retired Texas judge.  That number is less than counsel's lodestar amount (including expenses), and represents roughly 8.8 % of the estimated value of this settlement.  The Court therefore concludes, in light of the above factors, that such a figure is a reasonable fee for legal services and related costs in this case.[3]

**V. CONCLUSION**

For the reasons stated herein, the Court certifies the class, grants final approval to the proposed class action settlement, and awards attorney's fees of $625,000 to class counsel.

---

[3] The Court notes that, in connection with earlier motions, lawyers for Sony represented to the Court that they had engaged in extensive settlement discussions with counsel for the Meserole Plaintiffs in November 2008, and that they were able to agree on all material terms to a proposed settlement with less benefit to class members, but did not reach a settlement because the attorney's fees requested by counsel for the Meserole Plaintiffs were "so high that no final settlement was possible."  (Defendants' Memorandum of Law in Support of Motion for Preliminary Approval of Settlement, 2; Purcell Declaration in Support of Motion for Preliminary Approval of Settlement.)  Moreover, the Court notes that in the SXRD I litigation, it approved an award of attorney's fees of $1.6 million.  In re Sony SXRD Rear Projection Television Class Action Litigation, 2008 WL 1956267, at *15-16 (S.D.N.Y. May 1, 2008).  Class counsel had submitted a lodestar amount of $1,279,405.00, and requested a multiplier of 1.21.  Id.

IT IS SO ORDERED.
Dated:  New York, New York
      August 24, 2010

                                              Robert P. Patterson, Jr.
                                                U.S.D.J.

**Copies of this order were faxed to:**

Leigh Smith, Jennifer S. Czeisler, Sanford P. Dumain: **212-868-1229**
Milberg LLP
One Pennsylvania Plaza
New York, NY 10119

Jeffrey Alan Koncius, Joseph Jude Morgan Lange: **310-414-1882**
Lange & Koncius, LLP
222 No. Sepulveda Blvd., Suite 1560
El Segundo, CA 90245

Robert Ian Lax: **212- 818-1266**
Robert I. Lax & Associates
380 Lexington Avenue
31st Floor
New York, NY 10168

Richard Irving Werder, Jr., Katie McKenzie Anderson: **212-849-7100**
Quinn Emanuel Urquhart Oliver & Hedges LLP
51 Madison Avenue
New York, NY 10010

John Purcell: **213 -443-3100**
Quinn Emanuel Urquhart Oliver & Hedges LLP
865 South Figueroa Street, 16th Floor
Los Angeles, CA 90017

William Bernard Federman , Jennifer Faith Sherrill: **(405) 239-2112**
Federman & Sherwood
10205 North Pennsylvania Ave.
Oklahoma City , OK 73102

Kim Eleazer Richman: **(212) 687-8292**
875 Sixth Avenue, Suite 1808
New York , NY 10001

Michael Robert Reese: **(212) 253-4272**
Reese Richman LLP
230 Park Avenue
10th Floor
New York , NY 10169



**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543 | TEL: (213) 443-3000 FAX: (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3125**

WRITER'S INTERNET ADDRESS
**johnpurcell@quinnemanuel.com**

August 18, 2010

**Via Facsimile**



Honorable Robert P. Patterson, Jr.
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

Re:     *In re: Sony Corp. SXRD Rear Projection Television Marketing, Sales Practices &
        Products Liability Litigation*
        (Case No. 09 MD 2102 (RPP))
        *Cardenas v. Sony Corporation of America, et al.*
        (Case No. 09 CV 8652 (RPP))

Dear Judge Patterson:

    We represent defendants Sony Corporation of America, Sony Electronics Inc., and Sony
Corporation ("Defendants") in the above-captioned actions.

    On August 13, 2010, this Court held a final approval hearing ("August 13 Hearing") to
evaluate the fairness of the Amended Settlement Agreement executed by Defendants and
Plaintiff Cardenas on May 18, 2010 ("Amended Settlement Agreement"). During this hearing,
the Court requested that Defendants provide data about the value or cost of particular elements of

**quinn emanuel urquhart & sullivan, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 7000 FAX (212) 849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111-4788 | TEL (415) 875-6600 FAX (415) 875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, 5th Floor, Redwood Shores, California 94065-2139 | TEL (650) 801-5000 FAX (650) 801-5100
CHICAGO | 500 W. Madison Street, Suite 2450, Chicago, Illinois 60661-2510 | TEL (312) 463-2961 FAX (312) 463-2962
LONDON | 16 Old Bailey, London EC4M 7EG, United Kingdom | TEL +44(0) 20 7653 2000 FAX +44(0) 20 7653 2100
TOKYO | Akasaka Twin Tower Main Bldg., 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku, Tokyo 107-0052, Japan | TEL +81 3 5561-1711 FAX +81 3 5561-1712
MANNHEIM | Erzbergerstraße 5, 68165 Mannheim, Germany | TEL +49(0) 621 43298 6000 FAX +49(0) 621 43298 6100

The Honorable Robert P. Patterson
August 18, 2010
Page 2 of 7

the Amended Settlement Agreement ("August 13 Request").[1]  This letter responds to the Court's
August 13 Request.

## The Warranty Extensions[2]

### A. Cost to Defendants

The approximate cost of extending the manufacturer's limited warranty for service on the
optical block of all the KDS-50A2000, KDS-55A2000, KDS-60A2000, KDS-50A2020, KDS-
55A2020, KDS-60A2020, KDS-50A3000, KDS-55A3000, KDS-60A3000, KDS-R60XBR2,
KDS-R70XBR2, and KDS-70Q006 (collectively, "Televisions") is **$6,845,514.60**.  Notably, this
number is above and beyond the approximately $21.6M already incurred by Defendants for
voluntarily providing warranty extensions on the Televisions during the pendency of this
litigation.  Including the cost of the warranty extensions already undertaken, Defendants will
incur nearly $28.6M of costs associated with warranty extensions on the Televisions.

This number was calculated using the following data:

---

[1]  Defendants note that the costs outlined in this letter do not include costs in connection
with Paragraph 4.3 ("Warranty Fulfillment") of the Amended Settlement Agreement.  In addition
to the costs provided in this letter, Defendants have incurred costs associated with creating and
maintaining a dedicated information webpage as well as maintaining and staffing a dedicated
toll-free telephone number for diagnosis and repair.

[2]  *See* Amended Settlement Agreement, ¶ 4.2.

The Honorable Robert P. Patterson
August 18, 2010
Page 3 of 7

| KDS-50/55/60A2000 | |
|---|---|
| Actual July 2010 Costs[3] | $1,019,975.37 |
| Projected[4] August 2010 Costs | $932,594.66 |
| **KDS-50/55/60A2020** | |
| Actual Costs from October 2009[5] - July 2010 | $1,894,697.45 |
| Projected Monthly Costs ($243,134.42) x 5 Months (8/2010-12/2010) | $1,215,672.10 |
| **KDS-50/55/60A3000** | |
| Actual Costs from October 2009 - July 2010 | $288,613.24 |
| Projected Monthly Costs ($46,308.13) x 12 Months (8/2010-7/2011) | $555,697.53 |
| **KDS-60/70XBR2** | |
| Actual July 2010 Costs | $490,644.63 |
| Projected August 2010 Costs | $345,599.00 |
| **KDS-70Q006** | |
| Actual July 2010 Costs | $64,736.67 |
| Projected August 2010 Costs | $37,283.95 |
| **Total Warranty Extension Costs Incurred as a Result of the Settlement** | **$6,845,514.60** |

Additionally, at the August 13 Hearing, Timothy McGowan, Vice President of Service Engineering at Sony Electronics Inc., testified that he estimated the cost of warranty extensions for the Televisions to exceed $1M/month. The actual cost for warranty extensions for the month of July 2010, for example, was approximately $1.9M.

---

[3] "Costs" in this chart includes costs associated with the warranty extensions for labor, shipping, and parts.

[4] A projection of costs associated with warranty extension was generated for each Television covered by the Amended Settlement Agreement. The projections used above are the *average* of the actual costs of warranty extension incurred over the last four months: April 2010, May 2010, June 2010, July 2010.

[5] The costs for the 50/55/60A2020 and 50/55/60A3000 are calculated from October 2009 forward because the warranty extensions for these Televisions were the result of negotiations and execution of a term sheet with counsel for Plaintiff Cardenas.

3

The Honorable Robert P. Patterson
August 18, 2010
Page 4 of 7

### B. Value to Class Members

Another way to assess the benefit of the warranty extensions is to evaluate the value of those extensions to Class Members. From this view, the value of the warranty extension to Class Members is assessed by calculating what Class Members would have paid under an extended service agreement for the same amount of warranty extensions provided by the Amended Settlement Agreement.[6] Based on this view, the aggregate value of the warranty extensions to members of the Class is **$15,905,818.80**.

This number was calculated using the following data:

| Television Model | # of Class Members That Own This Model | Average Monthly Cost to Class Members[7] | # of Months of Warranty Extension Provided by Settlement Agreement | Total Cost to Class Members To Purchase The Warranty Extensions Provided by the Settlement Agreement |
|---|---|---|---|---|
| 50A2000 | 75,351 | $5.40 | 2 | $813,790.80 |
| 55A2000 | 28,144 | $5.40 | 2 | $303,955.20 |
| 60A2000 | 76,275 | $5.40 | 2 | $823,770.00 |
| 50A2020 | 18,760 | $5.40 | 15 | $1,519,560.00 |
| 55A2020 | 18,266 | $5.40 | 15 | $1,479,546.00 |
| 60A2020 | 21,100 | $5.40 | 15 | $1,709,100.00 |
| 50A3000 | 10,679 | $5.40 | 22 | $1,268,665.20 |
| 55A3000 | 19,458 | $5.40 | 22 | $2,311,610.40 |
| 60A3000 | 44,155 | $5.40 | 22 | $5,245,614.00 |
| 60XBR2 | 25,232 | $5.40 | 2 | $272,505.60 |
| 70XBR2 | 12,182 | $5.40 | 2 | $131,565.60 |
| 70Q006 | 2,420 | $5.40 | 2 | $26,136.00 |
| **Total Cost to Class Members for Warranty Extensions if Purchased via Extended Service Contract** | | | | **$15,905,818.80** |

[6]   Mr. Lax utilized this approach when he stated that the value of warranty extensions provided by the SXRD I Settlement was $31M. (*See* Dkt No. 15 at 49:3-53:7, Case No. 09 CV 8652 (RPP) (Declaration of John S. Purcell in Support of Motion for Preliminary Approval of Class Action Settlement (Exhibit 1 (Transcript of February 27, 2008 Hearing))).)

[7]   The "Average Monthly Cost to Class Member" was calculated by dividing the average cost of a 2-year extended service plan for the Televisions by 24 to identify the monthly cost of that plan. The estimated average monthly cost of an extended service plan for the Televisions is approximately $9. Because an extended service plan covers repairs for issues beyond the optical block, the "Monthly Cost to Class Member" used in the chart is discounted by 40%. Thus, the average monthly cost to Class Members used—$5.40— is only 60% of the average monthly cost to Class Members for an extended service plan.

The Honorable Robert P. Patterson
August 18, 2010
Page 5 of 7

Defendants also note that some of the dates presented in the "Date at Which 99% Sold" column were incorrect. (*See* August 10, 2010 Letter from Rick Werder to the Court, at 3, attached hereto as Exhibit 1.) The chart inadvertently included dates several months later than the actual dates by which 99% of these Televisions were sold. (*Id.*) An updated chart appears below with the corrected dates highlighted.

| Model | Release Date | Date At Which 99% Sold | Net Sales |
|-------|-------------|------------------------|-----------|
| KDS70Q006 | 1-Dec-04 | Aug-06 | 2,420 |
| KDS50A2000 | 20-Jul-06 | Oct-07 | 75,351 |
| KDS55A2000 | 27-Jul-06 | Feb-07 | 28,144 |
| KDS60A2000 | 14-Jul-06 | Oct-07 | 76,275 |
| KDSR60XBR2 | 25-Sep-06 | Oct-07 | 25,232 |
| KDSR70XBR2 | 25-Sep-06 | Jul-07 | 12,182 |
| KDS50A2020 | 14-Feb-07 | Aug-07 | 18,760 |
| KDS55A2020 | 14-Feb-07 | Sep-07 | 18,266 |
| KDS60A2020 | 14-Feb-07 | Aug-07 | 21,100 |
| KDS50A3000 | 15-Aug-07 | Mar-08 | 10,679 |
| KDS55A3000 | 4-Aug-07 | Mar-08 | 19,458 |
| KDS60A3000 | 2-Aug-07 | Mar-08 | 44,155 |
| **Total Net Sales of Settlement Televisions** | | | 352,022 |

This updated chart reflects that for certain models, the original two-year limited warranties on the optical blocks likely expired several months *earlier* than indicated in our previous correspondence with the Court because the original warranties are tied to the date of purchase. (*See id.*) Thus, the warranty extensions, which are tied to the product release date, provide more substantial benefits to Class Members than previously indicated.

### Reimbursement of Certain Extended Service Plan Purchases from Sony or Sony's Extended Service Plan Providers[8]

Under the terms of the Amended Settlement Agreement, Class Members may choose to receive reimbursement for out-of-pocket expenses incurred after October 1, 2008 in connection with the purchase of extended service contracts covering their Televisions. According to our

---

[8]   *See* Amended Settlement Agreement, ¶ 4.5.

The Honorable Robert P. Patterson
August 18, 2010
Page 6 of 7

records, there are fifty-two Class Members eligible for reimbursement and the cost of providing reimbursement to all of fifty-two Class Members is $14,415.22.

## Reimbursement of Certain Expenses Associated with SXRD Upgrade[9]

The cost of reimbursing expenses associated with upgrade to a different SXRD television was another benefit under the Amended Settlement Agreement. Defendants are aware of sixteen such upgrades and the cost of reimbursing those Class Members for the expenses associated with these upgrades is $13,218.24.

## Reimbursement of Expenses for Optical Block Repair[10]

At this time, Defendants do not know the precise amount of costs associated with reimbursing Class Members for reasonable out-of-pocket expenses incurred prior to the termination date of the warranty extensions. These costs will only be known to Defendants once Class Members submit claims for reimbursement of these expenses. At this time, Defendants have received 212 claims for reimbursement of out-of-pocket expenses. If each of these claims is found to be valid, the cost of reimbursement for the 212 existing claims could exceed $200,000. It is important to note that under Paragraph 4.4.2 of the Amended Settlement Agreement, Class Members have until the later of either (a) 180 days after a final approval judgment becomes non-appealable or is not reversed, vacated, or modified; or (b) 180 days after termination of the warranty extension application to their Televisions, to file their claims for reimbursement. The uncertainty in precisely stating these costs should weigh in favor of final approval of the Amended Settlement Agreement because Defendants have agreed to reimburse these out-of-pocket expenses without specific knowledge of what those costs are at this time.

Each of the benefits above ensures that the class members do not suffer out-of-pocket losses for any steps they took to address actual or potential issues with the optical blocks in Televisions during the extended warranty period. These benefits are especially valuable to Class Members as their primary claims against Defendants have already been dismissed once and are otherwise highly tenuous. Further, as outlined above, the warranty extensions alone will cost Defendants over $6.8M and would cost Class Members over $15M to obtain comparable warranty coverage. Accordingly, the Amended Settlement Agreement affords Class Members tremendous benefits and warrants final approval.

Please do not hesitate to contact us if you need any further information.

---

[9]  *See* Amended Settlement Agreement, ¶ 4.6.

[10]  *See* Amended Settlement Agreement, ¶ 4.4.

6

The Honorable Robert P. Patterson
August 18, 2010
Page 7 of 7

Respectfully submitted,


/s/ John S. Purcell_____
John S. Purcell

QUINN EMANUEL URQUHART
      & SULLIVAN, LLP

865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017

*Counsel for Defendants Sony Electronics
Inc., Sony Corporation of America, and
Sony Corporation*


Encl.

cc: All counsel of record (by email)

7

Exhibit
1

**quinn emanuel** trial lawyers

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | LONDON | TOKYO | MANNHEIM

WRITER'S DIRECT DIAL NO.
(212) 849-7231

WRITER'S INTERNET ADDRESS
rickwerder@quinnemanuel.com

August 10, 2010

**By Hand Delivery**
**Confidential -**

Honorable Robert P. Patterson, Jr.
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

Re:    *In re: Sony Corp. SXRD Rear Projection Television Marketing, Sales Practices &*
       *Products Liability Litigation*
       (Case No. 09 MD 2102 (RPP))
       *Cardenas v. Sony Corporation of America, et al.*
       (Case No. 09 CV 8652 (RPP))

Dear Judge Patterson:

      We represent defendants Sony Corporation of America, Sony Electronics Inc. ("SEL"),
and Sony Corporation ("Defendants" or "Sony") in the above-captioned actions. We are
submitting this letter in response to the Court's order dated July 28, 2010, directing Defendants
to make written submissions concerning eight different areas ("Order"). This is the first of two
responsive letters submitted by Defendants and concerns items 1-4, 7 and 8 of the Court's Order.

      Defendants provide the following responses to requests 1-4, 7 and 8 of the Order, and do
not object to making such information available publicly if the Court determines it necessary to
place this letter on the docket:

**quinn emanuel urquhart & sullivan, llp**

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543 | TEL (213) 443-3000 FAX (213) 443-3100
51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100
50 California Street, 22nd Floor, San Francisco, California 94111-4788 | TEL (415) 875-6600 FAX (415) 875-6700
555 Twin Dolphin Drive, 5th Floor, Redwood Shores, California 94065-2139 | TEL (650) 801-5000 FAX (650) 801-5100
500 W. Madison Street, Suite 2450, Chicago, Illinois 60661-2510 | TEL (312) 705-7400 FAX (312) 705-7401
16 Old Bailey, London EC4M 7EG, United Kingdom | TEL +44(0) 20 7653 2000 FAX +44(0) 20 7653 2100
Akasaka Twin Tower Main Bldg., 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku, Tokyo 107-0052, Japan | TEL +81 3 5561-1711 FAX +81 3 5561-1712
Erzbergerstraße 5, 68165 Mannheim, Germany | TEL +49(0) 621 43298 6000 FAX +49(0) 621 43298 6100

The Honorable Robert P. Patterson
August 10, 2010
Page 2 of 4

1.    **The Number of Notices of Preliminary Approval Mailed to Class Members.**

As described in the Declaration of Alexis Cohen filed on August 3, 2010 (Dkt. No. 107) ("Cohen Declaration"), Sony sent class members notice of the settlement, in a form approved by the Court, ("Notice") by e-mail to a total of 36,240 class members on June 4, 2010. On June 4 and 7, 2010, Sony sent the Notice by United States mail to an additional 14,685 class members. Thus, Sony sent the Notice by United States mail or e-mail to a total of 50,925 class members.

2.    **The Number of Letters Containing Such Notices Returned to Sender.**

As described in the Cohen Declaration, of the 36,240 e-mails sent by SEL, 6,028 were returned as undeliverable. Of the Notices sent by United States mail, 776 were returned to sender. Thus, of the 50,925 total Notices sent to class members, 44,121 were successfully delivered.

3.    **The Dates and Location of the Publication in Newspapers of Notice or Preliminary Approval.**

As described in the Cohen Declaration, Sony published the Summary Notice of Class Action Settlement (the "Summary Notice") in the *Wall Street Journal* on June 7, 2010, and the *USA Today* on June 14, 2010 . Copies of both notices were attached as exhibits to the Cohen Declaration. According to publicly available information, *USA Today* has a circulation of approximately 1.8 million, and the *Wall Street Journal* has a print circulation of approximately 1.7 million.

4.    **The Number of Unique Visitors to the Website Established by Sony for the Purposes of Providing Notice of the Settlement, from the Launch of the Website Through August 1, 2010.**

The Settlement Website has been live and publicly accessible since May 28, 2010, The Settlement Website published the Notice and the Proof of Claim form. As of August 1, 2010, the site had 17,637 unique visitors. The Settlement Website can be found at www.sony.com/sxrd2settlement.

7.    **The Number of Televisions Sets, for Each Model Covered by this Class Action, Sold and Not Returned; and**

8.    **The Time Period During Which Each of the Models Covered by this Class Action Was Distributed and Sold.**

The below chart describes the net sales for each model covered by the Settlement, the release date for each model, and the date by which 99% of the televisions had been sold by Sony.

2

The Honorable Robert P. Patterson
August 10, 2010
Page 3 of 4

Given the nature of distribution by hundreds of third party retailers, Sony is unable to track the final dates of sales to end users.

| Model | Release Date | Date At Which 99% Sold | Net Sales |
|---|---|---|---|
| KDS70Q006 | 1-Dec-04 | Aug-06 | 2,420 |
| KDS50A2000 | 20-Jul-06 | Oct-07 | 75,351 |
| KDS55A2000 | 27-Jul-06 | Feb-07 | 28,144 |
| KDS60A2000 | 14-Jul-06 | Oct-07 | 76,275 |
| KDSR60XBR2 | 25-Sep-06 | Jun-08 | 25,232 |
| KDSR70XBR2 | 25-Sep-06 | Mar-08 | 12,182 |
| KDS50A2020 | 14-Feb-07 | May-08 | 18,760 |
| KDS55A2020 | 14-Feb-07 | Apr-08 | 18,266 |
| KDS60A2020 | 14-Feb-07 | Apr-08 | 21,100 |
| KDS50A3000 | 15-Aug-07 | Apr-09 | 10,679 |
| KDS55A3000 | 4-Aug-07 | Jul-08 | 19,458 |
| KDS60A3000 | 2-Aug-07 | Jul-08 | 44,155 |

Total Net Sales of Settlement Televisions    352,022

Because of confidentiality concerns about commercially sensitive information requested by the Court in Items 5 and 6, Defendants will address those requests by separate letter.

Please do not hesitate to contact us if the Court needs any further information.

Respectfully submitted,

Richard I. Werder, Jr.

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

51 Madison Ave., 22nd Floor
New York, New York 10010

*Counsel for Defendants Sony Electronics Inc., Sony Corporation of America, and Sony Corporation*

3